**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**


LEE WHITWORTH and          )
PATRICIA SULLIVAN,         )
                           )
       Plaintiffs,     )
                           )
       v.              )          1:17cv1124
                           )
NATIONWIDE MUTUAL INSURANCE CO.,   )
                           )
       Defendant.      )


## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on "Defendant Nationwide Mutual Insurance Company's Motion for Partial Summary Judgment" (Docket Entry 17) (the "Summary Judgment Motion").[1]  For the reasons that follow, the Court should grant in part and deny in part the Summary Judgment Motion.

## BACKGROUND

### I.  Procedural History

Seeking recovery for water damage to their home and personal property, Patricia Sullivan and Lee Whitworth (collectively, the "Plaintiffs") initiated a lawsuit against the City of Durham, Garey R. Cooke, and Nationwide Mutual Insurance Company (the "Defendant") in the Durham County Superior Court in December 2016.  (See Docket

---

[1]  For legibility reasons, unless otherwise noted, this Opinion uses standardized capitalization and regular font in all quotations from the parties' materials.

Entry 1 at 1; see generally Docket Entry 1-1 at 16-25 (the "Complaint").)[2]    In relevant part, the Complaint sought a declaratory judgment against Defendant "that the damage caused in connection with the events described in th[e] Complaint is covered by [Plaintiffs'] Homeowners Policy with [Defendant]." (Docket Entry 1-1 at 21.)  Defendant moved for summary judgment on this claim, and, on November 16, 2017, the Durham County Superior Court denied that motion.  (See Docket Entry 1-4 at 121.)  In so doing, the Durham County Superior Court "f[ou]nd[] that, when the facts are viewed in the light most favorable to . . . Plaintiffs, there are genuine issues of material fact regarding whether coverage exist[s] under the policy of insurance in this case." (Id.)

Also on November 16, 2017, the Durham County Superior Court granted Plaintiffs leave to file an amended complaint.  (See id. at 124.)  Plaintiffs' amended complaint dropped their claims against Cooke and Durham, retained their declaratory judgment claim against Defendant, and added a claim under the North Carolina Unfair and Deceptive Trade Practices Act (the "UDTPA") against Defendant, based on alleged violations of North Carolina General Statute Sections 58-63-15(11)(c) and 58-63-15(11)(d).  (See, e.g., id. at 114-19; see also Docket Entry 7 (the "Amended Complaint"), ¶¶ 21-

---

2 Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination.  In addition, citations to deposition transcripts also include the transcript's page and line numbers for any exhibit that contains multiple transcript pages on a single exhibit page.

51.)  In December 2017, Defendant removed the lawsuit to this Court on the basis of diversity jurisdiction.  (<u>See</u> Docket Entry 1 at 2, 4.)  Six months later, Defendant filed its Summary Judgment Motion, seeking summary judgment solely on the UDTPA claim.  (<u>See</u> Docket Entry 17 at 1-2.)   Plaintiffs have responded in opposition (<u>see</u> Docket Entry 20), and Defendant has replied (<u>see</u> Docket Entry 23).

## II.  Factual History

As relevant to the Summary Judgment Motion, and construed in the light most favorable to Plaintiffs, the record reflects the following:

Plaintiffs reside in a house at the intersection of West Seeman Street and Glendale Avenue in Durham, North Carolina.[3]  A

_____

3  Plaintiffs altered the address of this residence from 121 West Seeman Street in the Complaint (<u>see</u> Docket Entry 1-1 at 17) to 123 West Seeman Street in the Amended Complaint (<u>see</u> Docket Entry 7, ¶ 8).  This alteration appears to be a typographical error, as, for instance, the contemporaneous evidence reflects an address of **121** West Seeman Street (<u>see, e.g.</u>, Docket Entry 18-7 at 1 ("This is Ken Little, Claim Adjuster with [Defendant]. . . . [conducting an interview] on Thursday, January 23, 2014. . . . I'm currently at Ms. Sullivan's residence at 121 West Seeman in Durham, North Carolina, and I'm meeting with her daughter Lee Whitworth regarding . . . the damage to Ms. Sullivan's home."); <u>see also id.</u> (Whitworth giving her address as "121 West Seeman Street Durham, North Carolina")).  (<u>See also, e.g.</u>, Docket Entry 1-4 at 102 (indicating, in redline showing alterations between the Complaint and Amended Complaint, the "123 W. Seeman Street" address as an unchanged statement); <u>but see</u> Docket Entry 22, ¶ 3 (providing 123 West Seeman address in Whitworth's July 2018 declaration).)  As Defendant admits that it entered into an insurance policy with Sullivan for her residence (<u>see</u> Docket Entry 9, ¶¶ 8, 18) — and raises no challenges regarding the residence's address (<u>see id.</u>; <u>see</u>

storm drainage system runs across the backyard of Plaintiffs'
residence, commencing a few houses upstream from (i.e., east of)
Plaintiffs' residence with an open channel that leads into the
mouth of a pipe. (<u>See</u> Docket Entry 18-5 at 3-4 (173:11 to 174:24);
<u>see also</u> Docket Entry 18-6 at 1.) A storm drain in Plaintiffs'
backyard connects to this pipe before the pipe crosses under
Glendale Avenue. (Docket Entry 18-5 at 3 (170:2-19, 172:7 to
173:20); <u>see also</u> Docket Entry 18-6 at 1.) This drain lies south
of Plaintiffs' house, roughly aligned with the house's western
edge. (<u>See</u> Docket Entry 18-6 at 1.) In addition, Plaintiffs'
basement contains a drain, which Whitworth believes connects to the
storm drainage system. (<u>See</u> Docket Entry 18-2 at 4 (28:11-22).)
After passing through Plaintiffs' backyard, the pipe runs
underneath Glendale Avenue and through properties located on the
other side of Glendale Avenue from Plaintiffs' residence, including
Cooke's residence at 1107 Glendale Avenue. (<u>See</u> Docket Entry 18-6
at 1; <u>see also</u> Docket Entry 18-5 at 3-4 (172:7 to 175:10).)

At all relevant times, two additional storm drains existed
between Plaintiffs' residence (on the eastern side of Glendale
Avenue) and the Cooke residence (on the western side of Glendale
Avenue). (<u>See</u> Docket Entry 18-6 at 1; <u>see also</u> Docket Entry 18-2
at 4 (26:21 to 27:7); Docket Entry 18-5 at 3 (171:7 to 172:10).)

---

<u>also</u> Docket Entries 17, 18, 23) — the specific address of said
residence does not affect resolution of the Summary Judgment
Motion.

One of those drains (the "Glendale drain") lies (i) adjacent to Plaintiffs' property "in the Glendale right of way at the curb line" (Docket Entry 18-5 at 3 (171:12-13); see id. (171:7 to 172:10); Docket Entry 18-6 at 1) and (ii) approximately equidistance from Plaintiffs' residence as the drain in Plaintiffs' backyard (the "backyard drain") (see Docket Entry 18-6 at 1).[4] The Glendale drain lies downhill of the backyard drain, such that "the pipe is about four feet below the surface of th[e backyard drain]" (Docket Entry 18-5 at 3 (170:17-18)), but the Glendale drain connects with the pipe "roughly two and a half feet below the pipe that's directly below the [backyard drain]" (id. (172:3-5)). (See id. (170:10-19, 172:3-10).)

At some point prior to December 29, 2013, a sinkhole opened above the drainage pipe in Cooke's yard. (See, e.g., Docket Entry 18-2 at 6 (57:3-6); Docket Entry 18-5 at 2 (166:24 to 167:5); Docket Entry 18-7 at 1-6.) Cooke filled the sinkhole with gravel and concrete, resulting in a total blockage of the drainage pipe beneath his property. (See Docket Entry 18-3 at 3 (18:6 to 19:7), 4 (24:4-14); Docket Entry 18-4 at 1; Docket Entry 18-7 at 1-6; see also Docket Entry 1-1 at 33.) On December 29, 2013, a rain storm occurred, but, because of the pipe blockage, several feet of water accumulated in Plaintiffs' basement. (See Docket Entry 18-2 at 6

---

    4  The Glendale drain lies north and west of the backyard drain. (See id.)

(54:2 to 55:6); Docket Entry 18-4 at 1; Docket Entry 18-7 at 2, 6, 11.) This water caused extensive damage to Plaintiffs' residence as well as to personal property stored in the basement. (See Docket Entry 18-2 at 8 (65:4-7); Docket Entry 18-7 at 7-12.) The basement flooded twice more before January 23, 2014 (see Docket Entry 18-7 at 8), and again in March 2014 (see Docket Entry 18-2 at 10 (72:12-15)).

Plaintiffs reported the December incident to Defendant on or about January 17, 2014. (See id. at 7 (59:15-17).) On January 23, 2014, "Ken Little, Claim Adjuster with [Defendant]," came to Plaintiffs' residence to investigate the damage. (Docket Entry 18-7 at 1.) During his visit, Little took various photographs of the property, including "all the damage" in the basement (Docket Entry 18-3 at 2 (17:12)). (See id. (17:10-12); see also Docket Entry 18-2 at 9 (66:15 to 67:1); Docket Entry 18-3 at 3 (20:15-19).) He also conducted a recorded interview with Whitworth and her then-husband regarding the incident. (See generally Docket Entry 18-7; see also Docket Entry 18-2 at 6 (56:7), 8 (64:24 to 66:9).) During that interview, Whitworth indicated that the water "was in the entire basement. Uh, [they] tried . . . [They] have a passive drainage system," but "that couldn't have been worked [sic]." (Docket Entry 18-7 at 2 (ellipsis in original).) She further stated that the water remained in the basement for a day or two after the December 29 incident, as "[i]t drained . . . slowly."

(Id. at 13.)   At the conclusion of his visit, Little informed Whitworth that "there [wa]s no coverage" because under the relevant policy "there is no coverage for a loss caused by surface water, and that's what the cause of loss was in this case." (Docket Entry 18-3 at 3 (18:1-5); see also Docket Entry 18-2 at 8 (65:7-9).)

Following his visit, Little prepared a denial letter, which Defendant's "Raleigh Durham Claims Manager For Property Claims" (Docket Entry 18-3 at 7 (48:23-24)) reviewed and approved. (See id. at 6 (38:25 to 39:8), 7 (48:21 to 49:10); Docket Entry 18-9 at 4 (95:4-5).) The denial letter explained the reason "why there was no coverage of the loss." (Docket Entry 18-3 at 6 (39:5).) This letter included only "the relevant sections [of the insurance policy] that apply to [the] specific claim." (Docket Entry 18-9 at 4 (95:13-14).) In pertinent part, the denial letter states:

**Policy details**
The NC HO-3 policy states the following:  per page DI of the HO-3 Policy- Section 1- Exclusions which states "A. We do not insure for loss caused directly or indirectly by any of the following.  Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.  These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area."

"3. Water Damage
    Water Damage means
    a. Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these,
        whether or not driven by wind;"

    "caused by or resulting from human or animal forces or any act of nature."

**About our decision**

Our review showed that surface water entered the basement
area of your home and caused damage to both real and
personal property.  The water level was approx 3-4' high
in the basement.  A blockage in a drain line caused water
to back up and overflow out of a drain in your back yard.
The surface water accumulated and then migrated into your
basement.  The blockage in the drain line originated on
an adjacent property.

Based upon the details of your loss previously stated, we
are unable to extend coverage for your claim.

(Docket Entry 18-4 at 1 (bold font, spacing, and line divisions in

original).)

At his deposition in this matter, Little testified that he did

not know of the drain in Plaintiffs' basement.  (See Docket Entry

18-3 at 3 (19:8 to 20:15).)  He further indicated that he "saw no

evidence.  There was no evidence that [he] saw that water backed

directly up through a drain inside of the basement.  [He] didn't

see any evidence to indicate that."  (Id. at 4 (22:1-4).)  In her

deposition, though, Whitworth expressed her belief that water

entered the basement in part through the basement drain, as bubbles

appeared in the water in the area of the basement drain, similar to

the way water "was bubbling up through" (Docket Entry 18-2 at 6

(55:17)) the backyard drain.  (See id. (54:2 to 55:17).)  Little

"d[id]n't think th[e basement drain's existence] would have had any

bearing on the coverage based on the exclusions clause in the

policy about if there are any other events contributing

concurrently to the loss.  [He] d[id]n't see how that would have —

fact that would have changed the coverage decision for the claim."

(Docket Entry 18-3 at 4 (25:9-14).)  Nevertheless, according to Little:

> the presence of that drain, and even the possibility of water may have come up through it should be looked at as a possible factor and reviewed.  It may not change the coverage decision in the least. It may — it may not have any bearing on it, but in fairness to the customer, it needs to be looked at.
>
> Any facts that come of light after a claim has been handled should always be reviewed by the insurance company.  [He] think[s] the insurance company has a duty to do that.

(Id. at 5 (34:14-24).)

### III.  Insurance Policy Provisions

Plaintiffs' insurance policy provides coverage for "direct physical loss to [their residence]" unless, inter alia, one of the "Section I - Exclusions" applies.  (Docket Entry 18-1 at 19.)  "Section I - Exclusions" of the insurance policy states:

> A.   [Defendant] do[es] not insure for loss caused directly or indirectly by any of the following.  Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

(Id. at 23.)   Exclusion A.3 for Defendant's North Carolina insurance policies specifies:

> 3. Water
>
> This means:
>
> a. Flood, including but not limited to flash flood, surface water, waves, including tidal wave and tsunami, seiche, tides, tidal water, overflow of any body of water, or spray from any of these, all

whether or not driven by wind, including storm
surge;

   b. Water which:
     (1) Backs up through sewers or drains; or
     (2) Overflows or is otherwise discharged from a
     sump, sump pump or related equipment;

   c. Water below the surface of the ground, including
     water which exerts pressure on, or seeps, leaks or
     flows through a building, sidewalk, driveway,
     patio, foundation, swimming pool or other
     structure; or

   d. Waterborne material carried or otherwise moved by
     any of the water referred to in 3.a. through 3.c.
     of this exclusion.

This Exclusion (3.) applies regardless of whether any of
the above, in 3.a. through 3.d., is caused by an act of
nature, an act of man or is otherwise caused.

This Exclusion (3.) applies to, but is not limited to,
escape, overflow or discharge, for any reason, of water
or waterborne material from a dam, levee, seawall or any
other boundary or containment system whether natural,
man-made or is [sic] otherwise made.

However, direct loss by fire, explosion or theft
resulting from any of the above, in 3.a. through 3.d., is
covered.

(Id. at 52-53.)

   Notably, though, the surface water (A.3.a.) and subterranean

water (A.3.c.) exclusions do not apply to losses to the residence

resulting from an accidental discharge or overflow of
water or steam from within a:

(i)  Storm drain, or water, steam or sewer pipe, off the
     residence premises; or
(ii) Plumbing, heating, air conditioning or automatic
     fire protective sprinkler system or household
     appliance on the residence premises. This includes
     the cost to tear out and replace any part of a
     building, or other structure, on the residence

premises, but only when necessary to repair the system or appliance. However, such tear out and replacement coverage only applies to other structures if the water or steam causes actual damage to a building on the residence premises.

[Defendant] do[es] not cover loss to the system or appliance from which this water or steam escaped.

For purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, down spout or similar fixtures or equipment.

(Id. at 20.)

The policy additionally insures against loss to personal property caused by "12. Accidental Discharge Or Overflow Of Water Or Steam" as follows:

a. This peril means accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

b. This peril does not include loss:
(1) To the system or appliance from which the water or steam escaped;
(2) Caused by or resulting from freezing except as provided in Peril Insured Against 14. Freezing;
(3) On the residence premises caused by accidental discharge or overflow which occurs off the residence premises; or [(id. at 21-22)]
(4) Caused by constant or repeated seepage or leakage of water or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years. [(Id. at 52.)[5]]

c. In this peril, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

---

5 The policy contains a section 12.b.(4) specific to North Carolina. (See id.)

d. Section I — Exclusion A.3. Water Damage, Paragraphs a.
and c. that apply to surface water and water below the
surface of the ground do not apply to loss by water
covered under this peril.

(<u>Id.</u> at 22.)

## **DISCUSSION**

### **I. Summary Judgment Standards**

"The [C]ourt shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a). A genuine dispute of material fact exists "if the
evidence is such that a reasonable jury could return a verdict for
the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.
242, 248 (1986). The movant bears the burden of establishing the
absence of such dispute. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317,
323 (1986).

In analyzing a summary judgment motion, the Court "tak[es] the
evidence and all reasonable inferences drawn therefrom in the light
most favorable to the nonmoving party." <u>Henry v. Purnell</u>, 652 F.3d
524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving
"party is entitled 'to have the credibility of his evidence as
forecast assumed, his version of all that is in dispute accepted,
[and] all internal conflicts in it resolved favorably to him.'"
<u>Miller v. Leathers</u>, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc)
(brackets in original) (quoting <u>Charbonnages de France v. Smith</u>,
597 F.2d 406, 414 (4th Cir. 1979)). If, applying this standard,

the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996).

However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Moreover, "the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." Lewis v. Eagleton, 4:08-cv-2800, 2010 WL 755636, at *5 (D.S.C. Feb. 26, 2010) (citing Barber v. Hospital Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992)), aff'd, 404 F. App'x 740 (4th Cir. 2010); see also Pronin v. Johnson, 628 F. App'x 160, 161 (4th Cir. 2015) (explaining that "[m]ere conclusory allegations and bare denials" or the nonmoving party's "self-serving allegations unsupported by any corroborating evidence" cannot defeat summary judgment). Finally, factual allegations in a complaint or court filing constitute evidence for summary judgment purposes only if sworn or otherwise made under penalty of perjury. See Reeves v. Hubbard, No. 1:08cv721, 2011 WL 4499099, at *5 n.14 (M.D.N.C. Sept. 27, 2011), recommendation adopted, slip op. (M.D.N.C. Nov. 21, 2011).

## II. UDTPA Claim Analysis

The UDTPA, North Carolina General Statute Section "75-1.1, prohibits unfair and deceptive acts or practices, generally, and North Carolina's 'Unfair Claim Settlement Practices' statute, N.C. Gen. Stat. § 58-63-15(11) [(the 'UCSP')], defines unfair practices in the settlement of insurance claims." Elliott v. American States Ins. Co., 883 F.3d 384, 396 (4th Cir. 2018). Although Section "58-63-15(11) provides that the Commissioner of Insurance has the authority to enforce the provisions of that subsection," Gray v. North Carolina Ins. Underwriting Ass'n, 352 N.C. 61, 69, 529 S.E.2d 676, 682 (2000),[6] the conduct it prohibits can "support a finding of unfair or deceptive acts or practices" under the UDTPA, id. at 71, 529 S.E.2d at 683. Accordingly, for private plaintiffs, "the remedy for a violation of section 58-63-15 is the filing of a section 75-1.1 claim." Country Club of Johnston Cty., Inc. v. United States Fid. & Guar. Co., 150 N.C. App. 231, 244, 563 S.E.2d 269, 278 (2002) (internal quotation marks and emphasis omitted). "Thus, an individual may file an independent [Section] 75-1.1 claim, or may file a [Section] 75-1.1 claim that relies on a violation of § 58-63-15(11)." Elliott, 883 F.3d at 396.

---

6  More specifically, the statute "create[s] a[] cause of action in favor of . . . the Commissioner" when an insurance company "[c]ommit[s] or perform[s] with such frequency as to indicate a general business practice" any of fourteen specified actions. N.C. Gen. Stat. § 58-63-15(11).

In this regard, the United States Court of Appeals for the Fourth Circuit recently explained:

> To establish a violation of § 58-63-15(11), a complainant must show that the defendant committed one of the enumerated unfair practices in the settlement of insurance claims, and that such conduct was committed or performed "with such frequency as to indicate a general business practice." [N.C. Gen. Stat.] § 58-63-15(11). To establish a claim under § 75-1.1(a), a complainant must show: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, (3) which proximately caused injury to plaintiff. *Gray*, 529 S.E.2d at 681. "The determination of whether an act or practice is an unfair or deceptive practice . . . is a question of law for the court." *Id.* (citation omitted). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 653 S.E.2d 393, 398 (2007) (internal quotation marks omitted). However, "such conduct that violates [§ 58-63-15(11)] constitutes a violation of [Section] 75-1.1, as a matter of law, without the necessity of an additional showing of frequency indicating a 'general business practice,'" because "such conduct is inherently unfair, unscrupulous, immoral, and injurious to consumers . . . ." *Gray*, 529 S.E.2d at 683 (holding as to violations of § 58-63-15(11)(f), specifically); *Country Club*, 563 S.E.2d at 279 (extending *Gray* to apply to all conduct described in § 58-63-15(11)).

Elliott, 883 F.3d at 396 (ellipses and second set of brackets in original).

Here, Plaintiffs allege that Defendant violated the UDTPA by engaging in conduct the UCSP prohibits. More specifically, Plaintiffs assert that Defendant "[f]ail[ed] to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies," N.C. Gen. Stat. § 58-63-15(11)(c), and "[r]efus[ed] to pay claims without conducting a reasonable

15

investigation based upon all available information," N.C. Gen. Stat. § 58-63-15(11)(d). (<u>See</u> Docket Entry 7, ¶¶ 26, 27, 48.) In response, Defendant maintains that "Plaintiffs have failed to produce any evidence to support their claims, and even if [Defendant] wrongly denied their claims (although it did not), the undisputed material facts come nowhere close to supporting Plaintiffs' claim for unfair and deceptive trade practices." (Docket Entry 18 at 2.) Plaintiffs dispute these assertions. (<u>See</u> Docket Entry 20.)[7]

---

7    In their opposition to the Summary Judgment Motion, Plaintiffs contend that Defendant violated Section 58-63-15(11)(a) (<u>see</u> <u>id.</u> at 12, 13), Section 58-63-15(11)(b) (<u>see</u> <u>id.</u> at 13, 14), Section 58-63-15(11)(f) (<u>see</u> <u>id.</u> at 16), and Section 58-63-15(11)(h) (<u>see</u> <u>id.</u>), in addition to Section 58-63-15(11)(c) and Section 58-63-15(11)(d) (<u>see</u> <u>id.</u> at 14-16). However,

> Fourth Circuit courts have consistently concluded that a party may not use a brief opposing summary judgment to amend a complaint. For that reason, the Court [should] not consider Plaintiff[s'] theory of [additional UCSP violations] as a basis for [their UDTPA] claim in resolving th[e Summary Judgment] Motion. In essence, this means that the Court [should] not allow Plaintiff[s] to raise a new argument at the summary judgment stage, the basis of which was not evident from the [Amended] Complaint.

<u>Robinson v. Bowser</u>, No. 1:12cv301, 2013 WL 5655434, at *3 (M.D.N.C. Oct. 16, 2013) (citations omitted) (collecting cases). <u>See also</u> <u>Wahi v. Charleston Area Med. Ctr., Inc.</u>, 562 F.3d 599, 617 (4th Cir. 2009) ("We have previously held, along with the Fifth, Sixth, Seventh, and Eleventh Circuits, that a plaintiff may not raise new claims after discovery has begun without amending his complaint.").

**A. Failing to Adopt Reasonable Standards Contention**

As a preliminary matter, the record reflects that Defendant provides guidelines for its appraisers, "called Best Claims Practices," which are "delivered to the[ appraisers] by their manager and reviewed periodically," that "help them organize their files so there's a consistency in claim files." (Docket Entry 18-9 at 4 (95:20 to 96:8).) Although not a checklist (see id. (95:15-17)), these guidelines outline how to handle a claim, including by obtaining labeled photographs that provide "an overview of the insured premises, a photograph . . ., if you can, of the origin and cause, and then any damage irrespective of how coverage may apply because [the appraiser] doesn't know at this point" (id. (97:8-12)). The guidelines also call for a recorded interview with the insured regarding the incident (see Docket Entry 18-3 at 7 (46:5-15)), as well as completing a "standard form log entry" (id (48:7-8)), called the "0225 Investigation" (id. (48:5-6)), that provides "a guideline of what need[s] to be addressed" (id. (48:13-14)). The summary judgment materials offer little further detail regarding these guidelines (see, e.g., Docket Entry 18 at 12-14), but Plaintiffs' expert testified that Defendant's "best claims practices looked good to [him]" (Docket Entry 18-8 at 2).

More specifically, in response to the question, "[d]id you see any evidence that [Defendant] failed to adopt and implement reasonable standards for the prompt investigation of claims?"

(id.), Plaintiffs' expert stated: "No.  I don't think [Defendant] followed [its] best claims practices, but [its] best claims practices looked good to me" (id.).  In opposing the Summary Judgment Motion, Plaintiffs similarly challenge Defendant's adherence to its investigation policies rather than their existence:

> While [Defendant] produced a document called Property Best Claims Practices as well as educational material provided to their claims handlers, there is no evidence that [Defendant] followed its own Best Claims Practices throughout the investigation and aftermath of the loss in this case.  [Defendant's] policies call for thorough damage investigation.  This investigation was perfunctory at best. . . .

(Docket Entry 20 at 14.)

In so arguing, Plaintiffs neither directly contend that such alleged failure to adhere to corporate policies contravenes Section 58-63-15(11)(c) nor provide any support for such proposition. (See id. at 14-16.)  Moreover, it seems unlikely that the mere failure to follow established procedures, without more, would contravene Section 58-63-15(11)(c), given that the UCSP appears focused on systemic issues in handling insurance claims.  See N.C. Gen. Stat. § 58-63-15(11) (providing the Commissioner of Insurance a cause of action to address actions committed "with such frequency as to indicate a general business practice").  Under the circumstances, including Plaintiffs' expert's agreement that Defendant adopted and implemented "good" standards for the investigation of claims (Docket Entry 18-8 at 2), Plaintiffs have

failed to establish a viable UDTPA claim based on a violation of Section 58-63-15(11)(c).

Accordingly, the Court should grant the Summary Judgment Motion insofar as it pertains to Plaintiffs' Section 58-63-15(11)(c) allegations.

## B.  Inadequate Investigation Contention

Defendant next maintains that it conducted a reasonable investigation and that its "denial of Plaintiffs' claim was reasonable in light of the information available to [Defendant] and the clear language in the policy excluding losses stemming from water damage."  (Docket Entry 18 at 14.)  In support of this proposition, Defendant first relies "on the exclusion for surface water under the Policy."  (Id. at 15.)  However, the surface water exemption does not apply to, inter alia, "an accidental discharge or overflow of water . . . from within a:  (i) [s]torm drain, or water . . . or sewer pipe, off the residence premises; or (ii) [p]lumbing . . . on the residence premises."  (Docket Entry 18-1 at 20; see also id. at 22.)  Here, at least one off-premises storm drain, namely the Glendale drain, appears a viable potential source of the basement water, particularly given that the Glendale drain (i) lies downhill of the backyard drain and (ii) between the backyard drain and Cooke's residence.  (See Docket Entry 18-6 at 1; see also Docket Entry 18-5 at 3 (170:10-19, 172:3-10).)  In addition, Plaintiffs maintain that the basement drain qualifies as

19

"plumbing" under the policy (see Docket Entry 20 at 7-9; see also Docket Entry 20-3 at 3), and Defendant does not dispute this contention (see Docket Entry 18 at 15-17). Thus, the surface water exemption would not preclude coverage for at least two potential sources of the basement water.

Defendant asserts, however, that the failure to investigate the basement drain does not preclude summary judgment given the exclusion for water that backs up through drains and sewers. (See id.)[8] In Defendant's view, "[e]ven if [it] failed to properly consider the basement drain as a source of water entry, this does not create an issue of material fact because Plaintiffs' claim for damages would still be barred under the Policy if water entered the basement through the floor drain as a 'plumbing system.'" (Id. at 15-16.) For multiple reasons, Defendant's argument falls short.

First, Defendant did not deny Plaintiffs' claim on the basis of the A.3.(b) exclusion for drain and sewer backups. (See Docket Entry 18-4 at 1.) Instead, it denied coverage on the basis of an exclusion — the A.3.(a) surface water exclusion — that, viewed in the light most favorable to Plaintiffs, does not apply to the basement drain. (See id.) Second, Defendant offers no support for the notion — implicit in its argument — that an insurance company can escape liability for "[r]efusing to pay [a] claim[] without

_____

8  The parties do not address the Glendale drain in their summary judgment arguments. (See Docket Entries 17, 18, 20, 23.)

conducting a reasonable investigation," N.C. Gen. Stat. § 58-63-15(11)(d), simply because a reasonable investigation might have uncovered legitimate grounds for refusing to pay such claim. (See Docket Entry 18 at 15-19; cf. Docket Entry 21, ¶ 9 (averring, in Plaintiffs' expert's affidavit, that, "[a] complete, thorough and unbiased investigation is required to properly apply insurance policy language" and that, "[t]o rely on an unproven exclusion to deny otherwise covered damages is in violation of local and national insurance industry standards").)

Third, Plaintiffs' expert reported that Defendant conducted an insufficient investigation (see Docket Entry 21 at 9-12) and that, as a consequence, "the cause of the Plaintiffs water damages is still unknown" (id., ¶ 9). (See also id., ¶ 6 ("The fact remains . . . that [Defendant] never investigated the cause of the loss and [in its summary judgment materials] speculates and assumes the water entered the premises through a floor drain."), id. at 11 ("Determining coverage in this case will be difficult, if not impossible due to the lack of a proper and determinative investigation.").)[9]  Fourth, whether water entered the basement

_____

        9  Plaintiffs' brief in opposition to the Summary Judgment Motion contains purported excerpts from Plaintiffs' expert's deposition. (See, e.g., Docket Entry 20 at 5.)  Apparently under the misconception that Defendant submitted that entire deposition rather than two pages thereof (see id. at 6; see also Docket Entry 18-8 (presenting solely pages 1 and 85 of the deposition)), Plaintiffs failed to submit as evidence the portions of the deposition that they included in their (unsworn) brief. (See Docket Entries 20-22.)  The Court thus cannot consider these

through the basement drain remains a disputed fact. (<u>Compare</u> Docket Entry 18-3 at 4 (22:1-4), <u>with</u> Docket Entry 18-2 at 6 (54:2 to 55:17).) Finally, even Little, the claim adjuster Defendant sent to investigate Plaintiffs' claim, testified that Defendant needed to investigate the basement drain:

> the presence of that drain, and even the possibility of water may have come up through it should be looked at as a possible factor and reviewed. It may not change the coverage decision in the least. It may — it may not have any bearing on it, but in fairness to the customer, it needs to be looked at.
>
> Any facts that come of light after a claim has been handled should always be reviewed by the insurance company. . . . [T]he insurance company has a duty to do that.

(Docket Entry 18-3 at 5 (34:14-24).)

Under these circumstances, Defendant's backup basement drain contentions fail to justify summary judgment. However, Defendant maintains that "[e]ven if [it] was wrong about the source of the surface water entering the home . . . honest disagreements about coverage, even if mistaken, are not sufficient to prove a claim for bad faith settlement practice." (Docket Entry 18 at 15 (citing <u>Topsail Reef Homeowner's Ass'n v. Zurich Specialties London, LTD</u>, 11 F. App'x 225, 239 (4th Cir. May 25, 2001)).) This argument also fails to justify summary judgment.

_____

alleged excerpts in resolving the Summary Judgment Motion. <u>See</u> <u>Reeves</u>, 2011 WL 4499099, at *5 n.14.

In North Carolina, "bad faith refusal to settle" an insurance claim constitutes a distinct cause of action, involving "(1) a refusal to pay after recognition of a valid claim; (2) bad faith; and (3) aggravating or outrageous conduct." <u>Topsail</u>, 11 F. App'x at 237 (internal quotation marks omitted); <u>accord</u> <u>Clear Creek Landing Home Owners' Ass'n, Inc. v. Travelers Indem. Co. of Conn.</u>, No. 1:12cv157, 2012 WL 6641901, at *2 (W.D.N.C. Dec. 20, 2012) ("North Carolina courts have recognized a tort for the bad faith refusal by an insurance company to settle a claim.").[10] Plaintiffs do not pursue such claim here. (<u>See generally</u> Docket Entry 7.) Rather, Plaintiffs asserted a UDTPA claim based on Defendant's alleged "[r]efus[al] to pay [a] claim[] without conducting a reasonable investigation based upon all available information," N.C. Gen. Stat. § 58-63-15(11)(d). (<u>See</u> Docket Entry 7, ¶ 27; <u>see also</u> <u>id.</u>, ¶ 48 ("[Defendant's] violations of [Section] 58-63-15(11) constitute a *per se* unfair trade practice under [Section] 75-1.1").) "[C]onduct that violates § 58-63-15(11)[(d)] constitutes a violation of [Section] 75-1.1, as a matter of law, . . . because such conduct is inherently unfair, unscrupulous, immoral, and injurious to consumers . . . ." <u>Elliott</u>, 883 F.3d at 396 (brackets and internal quotation marks omitted) (final ellipsis in original).

_____

10    It bears noting that an insurance company can independently violate the UCSP, and thus the UDTPA, by "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear," N.C. Gen. Stat. § 58-63-15(11)(f).

Accordingly, Defendant's argument regarding an alleged "honest disagreement" about coverage lacks relevance to Plaintiffs' UDTPA claim.

As a final matter, in its reply brief in support of its Summary Judgment Motion, Defendant raises for the first time the argument that "Plaintiffs cannot prevail on their [UDTPA] claim because [Defendant] did not cause their damages." (Docket Entry 23 at 3.)[11] However, "[t]he ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered." Clawson v. FedEx Ground Package Sys., Inc., 451 F. Supp. 2d 731, 734 (D. Md. 2006); see also Hunt v. Nuth, 57 F.3d 1327, 1338 (4th Cir. 1995) (explaining that "courts generally will not address new arguments raised in a reply brief because it would be unfair to the [other party] and would risk an improvident or ill-advised opinion on the legal issues raised"); HSK v. Provident Life & Accident Ins. Co., 128 F. Supp. 3d 874, 884 (D. Md. 2015) ("To the extent [the plaintiff] suggests that [the defendant's] non-compliance with the settlement agreement is an independent basis for liability, that argument is procedurally improper. By waiting to raise it until his reply

_____

11  In making this argument, Defendant relies on a decision from a neighboring court that predates its filing of the Summary Judgment Motion. (See id. (citing "Troutman v. CBE Insurance Corp., Docket No. 3:17-cv-464 (W.D.N.C. June 7, 2018).")); see also Docket Entry 17 at 2 (reflecting filing date of June 22, 2018).) As such, Defendant could have included any arguments regarding Troutman in its initial brief.

24

brief, [the plaintiff] deprived [the defendant] of an opportunity to respond, and deprived this court of the benefit of any such response.").  This rule has particular force here, given the Fourth Circuit's recent observation:

> it is unclear whether conduct that violates [Section] 58-63-15(11) is a per se violation of [Section] 75-1.1, or instead whether that conduct satisfies [Section] 75-1.1's conduct requirement of an unfair or deceptive act or practice, still requiring the complainant to show that the act or practice . . . proximately caused injury to the plaintiff before finding a violation of [Section] 75-1.1.

Elliott, 883 F.3d at 396 n.7.  Accordingly, the Court should not consider Defendant's newly raised damages argument in resolving the Summary Judgment Motion.

In sum, Defendant fails to establish its entitlement to judgment as a matter of law on Plaintiffs' investigation-based UDTPA claim.  The Court should therefore deny the Summary Judgment Motion as to this aspect of Plaintiffs' UDTPA claim.

## CONCLUSION

Defendant demonstrated its entitlement to judgment as a matter of law regarding Plaintiffs' Section 58-63-15(11)(c) allegations, but a material factual dispute exists regarding whether Defendant engaged in conduct that contravenes Section 58-63-15(11)(d) and, thus, Section 75-1.1.

**IT IS THEREFORE RECOMMENDED** that the Summary Judgment Motion (Docket Entry 17) be granted in part and denied in part as follows: summary judgment should be awarded to Defendant to the extent that

Plaintiffs' UDTPA claim relies on Section 58-63-15(11)(c) violations, but denied to the extent that it relies on Section 58-63-15(11)(d) violations.

    This 19th day of September, 2018.

                                             /s/ L. Patrick Auld

                                               **L. Patrick Auld**
                                **United States Magistrate Judge**